**MBKS COMPANY LIMITED, a British Virgin Islands company, MBKS Inc., a Delaware corporation, and MBKS II Inc., a Delaware corporation, Plaintiffs,**

v.

**Jagan M. REDDY, Defendant and Third–Party Plaintiff,**

v.

**Abdul–Elah A. Mukred and Lawrence G. Smith, Third–Party Defendants.**

**C.A. No. 1853–VCL.**

Court of Chancery of Delaware, New Castle County.

Submitted: March 19, 2007.
Decided: April 30, 2007.

---

Arthur G. Connolly, III, Connolly Bove Lodge & Hutz, LLP, Wilmington, DE; Peter J. Kahn, Edward C. Reddington, Williams & Connolly, LLP, Washington, DC, for the Plaintiffs and Third–Party Defendants.

Kathleen M. Miller, Joelle E. Polesky, Smith, Katzenstein & Furlow, LLP, Wil-

mington, DE, for the Defendant and Third–Party Plaintiff.

## OPINION

LAMB, Vice Chancellor.

The sole director of two Delaware corporations, purporting to implement a series of oral agreements with a fellow director, since deceased, adopted resolutions to cancel the common stock of the two Delaware entities (held of record by a British Virgin Islands corporation) and reissue a majority of the stock to himself. All three corporations move for summary judgment invalidating the resolutions. The corporations further move for a declaration that the British Virgin Islands corporation continues to own 100% of the stock of the Delaware entities and that its two designees are the sole directors of the Delaware entities.[1] Because the cancellation of the existing shares was ineffective without an amendment to the certificates of incorporation, and since no consideration or benefit was to be paid to the Delaware corporations for the stock issued to the former director, summary judgment will be granted.

## I.

### A. *The Parties*[2]

The plaintiffs in this action are MBKS Company Limited ("BVI"), a British Virgin Islands corporation, and two Delaware corporations, MBKS Inc. ("Inc.") and MBKS II Inc. ("II Inc."). Jagan M. Reddy, the defendant, counterclaim plaintiff, and third-party plaintiff, is a former di-

rector of BVI and claims to be the sole director of Inc. and II Inc. Abdul–Elah A. Mukred and Lawrence G. Smith, the third-party defendants, claim to be the only current directors of Inc. and II Inc.

### B. *The Delaware Entities Are Formed*

In late 1995, Inc. and II Inc. were formed for the purpose of purchasing two apartment complexes in Colorado. At the time of the formation, BVI was the 100% record owner of both Inc. and II Inc. The 100% record owner of BVI was Sultan Khalid Bin Mahfouz. Bin Mahfouz maintains that he is and always has been the equitable owner of BVI. The money to fund the initial purchase of the Colorado properties came from EII Equities, an entity owned by another man, the late Sami Baarma. Reddy maintains that Baarma, not Bin Mahfouz, was the equitable owner of the investment. At this stage of the litigation, the parties agree that the court must assume that Baarma was the equitable owner of the investment. Moreover, there is no competent evidence in the summary judgment record to support Bin Mahfouz's contention that he is the equitable owner, although he quite likely is.[3]

### C. *Baarma's Involvement With The Enterprise*

The disputes in this case arise from the long-time business relationship between Reddy and Baarma. Reddy began working for Baarma in 1991. He managed Baarma's assets and investments first as an employee of The National Commercial

---

1. The director counterclaims under 8 *Del. C.* § 225 that he is the rightful director of the two Delaware corporations. As the director did not move for summary judgment on these counterclaims, the court does not separately discuss them.

2. For the purposes of this motion for summary judgment, the facts detailed herein are taken in the light most favorable to Reddy, the non-moving party.

3. The evidence that Bin Mahfouz is the equitable owner, apart from his record ownership of BVI, consists only of hearsay statements in the affidavits of Smith and Mukred.

Bank, a financial institution based in Saudi Arabia with branches throughout the world, and eventually as Baarma's personal employee. Baarma was Bin Mahfouz's cousin. According to Bin Mahfouz, Baarma managed money for him and was given total discretion to deal with such money or property as Baarma saw fit.

### D. Reddy's Involvement In The Colorado Properties

From the formation of the Delaware entities in 1995 to 2005, Reddy served as an officer and director of Inc., II Inc., and BVI. In 1996, Reddy, at the direction of Baarma, invested more than $1 million of his money from his IRA account into another Baarma-controlled entity, Eidetics, in return for an interest in the Colorado properties.[4] At no time did either Baarma or Reddy attempt to formally recognize this investment and no shares were issued to Reddy in any of the three corporations prior to Baarma's death on March 12, 2005.

Reddy's indirect investment in the Colorado properties was finally given documented recognition on April 7, 2005. On that date, Reddy and Bin Mahfouz, as the only directors of BVI, signed resolutions recognizing Reddy's 25% interest in BVI, retroactive to October 21, 1994. The plaintiffs do not contest this 25% interest.

### E. The Course Of Dealing Between Reddy And Baarma

Reddy maintains that Baarma was, in fact, the beneficial owner of BVI, a proposition which the court will accept for purposes of this opinion. The facts in the record provide some evidence to support Reddy's good faith understanding of this "fact," whether it is true or not.[5] While Bin Mahfouz was the record owner of all the stock, Baarma seemingly funded the purchase, took proceeds into his own accounts, and managed and directed the investment in the properties on all levels.

The record also shows that Reddy and Baarma conducted their business in substantial part on the basis of oral agreements and mutual trust. This is demonstrated by the circuitous and often indirect method that money flowed into and out of the investments in the Colorado properties with a nearly complete lack of formal documentation. Thus, solely for the purposes of considering this motion, the court will assume that the oral agreements on which Reddy claims to rely did in fact exist as he claims.

### F. The 1996 Oral Agreement

At the core of this dispute is a series of agreements between Baarma and Reddy, assertedly reached in 1996 and 1997. While the substance of the agreements is

---

4. The reason for the investment in Eidetics was that Eidetics was on the verge of bankruptcy. Eidetics was in litigation. The investment by Reddy kept Eidetics afloat while the litigation was settled. The settlement was needed because EII Investments Limited, another Baarma-owned entity, held $6 million in Eidetics debentures that it was in danger of suffering a total loss on if Eidetics went into bankruptcy. In April 1999, the plaintiff to the litigation settled with Eidetics and EII Investments recouped $5,961,000. The following month, EII Investments transferred this money to EII Equities Limited, the entity that funded the initial purchase of the Colorado properties.

5. The record shows that the original money that funded the purchase of the Colorado properties came from EII Equities Limited, an entity 100% owned by Baarma. Moreover, when the mortgages on the properties were refinanced, the money from the refinancing flowed to a different account which Baarma controlled, Carpal Holdings Limited. Additionally, the property was initially considered for purchase, but passed on, by Mistral Management Limited, a company owned by Bin Mahfouz's father. Smith, the third-party defendant, who worked for Mistral, noted "that no, we don't want to invest in that." Smith Dep. 36–38, Smith Exs. 12, 15.

not completely definite on the present record, Reddy maintains that he and Baarma agreed that he was to be granted a further interest in the Delaware entities in exchange for an additional capital contribution.[6] At first, the purpose of this capital contribution was to provide the equity portion of the financing needed for Inc. and II Inc., acting through a planned third Delaware entity, MBKS III Inc., to acquire another apartment building in Colorado. This initial agreement is partly reflected in two sets of documents. The first documents are the original resolutions, signed by Baarma and Reddy, but undated, that authorize the sale to Reddy of 3.4 shares in each of Inc. and II Inc. for $200,000 per share or a total of $680,000 each.[7] The next documents are copies of the same resolutions, dated May 20, 1996, with Reddy's initialed handwritten modifications changing the numbers to 10 shares at $68,000 per share. Reddy maintains that the modifications were made with Baarma's consent, although Baarma did not sign or initial the changes and the corporations' law firm did not have copies of the changed resolutions. Under either of the resolutions and the oral agreement that they evidence, the amount of consideration was to be $680,000 to each of Inc. and II Inc. The only difference between the terms of the original resolutions and the oral agreement reflected in the unilaterally modified resolutions is the number of shares Reddy would receive in exchange for his capital contribution.

The second part of the 1996 oral agreement, of which there is no written evidence, was that if a United States citizen became a record shareholder of BVI, that corporation would essentially distribute its stock in the Delaware entities to its stockholders. Reddy is a United States citizen, but Bin Mahfouz and Baarma were not. Apparently, this agreement (justified by Reddy on tax considerations) was not disclosed by either Baarma or Reddy to anyone else. After Baarma's death, Reddy continued to hold this agreement close to his vest, even in negotiating with Bin Mahfouz for a 25% interest in BVI. According to Reddy, once the April 7, 2005 resolution was signed, this 1996 agreement sprang to life. Yet, Reddy continued to conceal its existence while he and his family pursued a further $6.1 million settlement with Bin Mahfouz and others relating to Baarma's estate.

### G. *The 1997 Modification To The 1996 Oral Agreement*

Reddy claims that, at some point in 1997, when it became apparent that Inc. and II Inc. did not need the additional capital, he and Baarma modified the share acquisition agreement by further oral contract. The modification called for Reddy to receive the additional shares in Inc. and II Inc. in exchange for his payment of monies to certain individuals to be named by Baarma (including his mistresses and household staff), in lieu of payment to Inc. or II Inc. The payments were to occur on Baarma's death and were Baarma's way of taking care of these individuals in the absence of having a will. Reddy agreed with this modification of the original agreement and intended to pay Baarma's designees upon Baarma's death in exchange for an increased interest in the Delaware entities that owned the Colorado properties.

### H. *The August 2005 Resolutions*

On August 23, 2005, following Baarma's death and the April 2005 recognition of

---

**6.** Reddy has changed several times the amount of the interest he is entitled to under this agreement. For the purposes of this opinion, it is irrelevant.

**7.** The court notes that this reflects a cost on a per share basis that is approximately equivalent to the original investment by EII Equities for the purchase of the Colorado properties.

Reddy's 25% interest in BVI, Reddy, acting as the sole director of Inc. and II Inc., drafted, signed, and purported to adopt resolutions that he claims implemented his 1996 and 1997 understandings with Baarma.[8] The two actual resolutions read: [9]

1. Resolved that Jagan Reddy be granted 10 shares of MBKS Inc[.], diluting the ownership of [BVI].

2. Resolved that the 10 shares held by [BVI] be reissued in the names of the shareholders of the company. Therefore, 7.5 shares will be held in the name of Sultan Bin [Mahfouz] and Jagan Reddy will hold 2.5 shares.

8. The facts, even taken in the light most favorable to the defendant, indicate the 1996 oral agreement was modified in 1997 after Reddy's capital was no longer needed to fund MBKS III Inc. The 1997 modification directed payment not to the corporation to fund a new business venture, but to Baarma's designees to circumvent the estate process. It was this oral agreement, as modified, that Reddy implemented by his August 2005 resolutions. There can be no reasonable inference for summary judgment other than that the oral agreement in effect, if any such agreement existed, was the oral agreement as recorded in the August 2005 resolutions drafted by Reddy reflecting the modification of the agreement in 1997 to direct payment to Baarma's designees.

9. The resolutions are identical other than Reddy Ex. 25 is for II Inc. and Reddy Ex. 26 is for Inc.

10. The resolutions (Reddy Ex. 25–26) recite the following:
    * About May 20, 1996 the Directors of the company approved the purchase by Jagan Reddy of 10 shares of the Company.
    * Subsequently, during 1997, because MBKS Inc. did not require the money, Sami Baarma and Jagan Reddy verbally agreed that Jagan Reddy, when he exercised that option, will not contribute to the capital of the company but be issued the 10 shares for making a payment to certain individuals named by Sami Baarma.

The documents include a number of "Whereas" clauses that are intended to explain Reddy's actions, conveying his version of the undocumented agreements with Baarma.[10]

### I. The December 2005 Resolutions

Reddy received the $6.1 million settlement in October and only then told Bin Mahfouz about the August resolutions, resigning as a director of BVI on October 31, 2005. At that point, Bin Mahfouz and BVI acted, executing written consents purporting to elect Mukred and Smith to the boards of Inc. and II Inc. on November 1, 2005.[11] BVI executed a second set of written consents purporting to remove Reddy

* Also, Jagan Reddy was not buying the shares from MBKS Company Limited.
* Essentially, Sami Baarma was reducing the ownership of Sultan Bin [Mahfouz] to 37½% of MBKS Inc., Jagan Reddy would retain his 25% interest of MBKS Inc. and 37½% of the company will be held by Jagan Reddy for the benefit of his mistresses and his Saudi based household staff.
The resolutions also purport to require Reddy to make a payment to Baarma's mistresses and employees based on the after tax value of 37½% of MBKS, Inc. as of the day of Baarma's death.

The August resolutions similarly purport to implement the second 1996 oral agreement that triggered when Reddy became a record holder of BVI stock in April 2005. The resolutions state "[p]ursuant to an agreement between MBKS Inc. and MBKS Company limited that required the shares of MBKS Company Limited to be held by its shareholders if a United States citizen was a shareholder of MBKS Company Limited, Jagan Reddy has now decided, for tax reasons, to own the shares directly and not via MBKS Company Limited."

11. The record shows unsigned copies of the written consents electing Mukred and Smith, but does not include signed copies or evidence that the consents were delivered to the corporations. BVI clearly had the power to take this action and the court assumes that it did so in the absence of a dispute of material fact. In any event, as the record establishes

from the boards of the Delaware entities on December 17, 2005. The December 17, 2005 written consents were delivered to the corporations' registered agent on December 23, 2005.

The three corporations filed this action for on December 20, 2005 seeking declaratory judgment and other relief for alleged breaches of fiduciary duty, fraud, negligent misrepresentation, and other misconduct committed by Reddy. Reddy cross-claimed for declaratory judgment as to his ownership of the Delaware entities and for a determination of directors under 8 *Del. C.* § 225. After litigation began, and apparently recognizing the legal deficiency of his acts, Reddy purported to pass further resolutions at Inc. and II Inc., dated December 24, 2005, granting himself until the end of January 2006 to pay $680,000 to each of them. While Reddy maintains the payment to the certain persons was impossible, he admits that the payment to the corporations, which did not occur until after the self-imposed deadline, was in response to the litigation filed in this court.

Reddy sent payments, totaling $1,300,000, to accounts held by Inc. and II Inc. by the end of January 2006. He reserved $60,000 for his legal fees, although he never attempted to pass any resolution indemnifying himself for legal fees. Interestingly, the payments were earmarked $150,000 for Inc. and $1,150,000 for II Inc., not $680,000 to each entity as the purported December 24th resolutions

required. The reason given by Reddy for the variance in the amounts paid was that one property needed a new roof.

The corporations move for summary judgment on all their claims. Reddy opposes that motion, challenging the legality of his removal as director and the sufficiency of the November 1, 2005 written consents naming Smith and Mukred as directors, but does not move separately for summary judgment on his cross-claims and third-party claims. At the time of this opinion, Reddy represents that he has paid the full amount called for by the December 24th resolutions and oral agreements by virtue of paying an additional $60,000 on February 23, 2006.

## II.

To prevail on a motion for summary judgment, the moving party must show that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."[12] For summary judgment, the court does not weigh the evidence or determine the truth of the matter, but determines only if there is a genuine issue for trial.[13] In deciding a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party.[14] The moving party bears the burden of demonstrating that there is no material question of fact.[15] "A party opposing summary judgment, however, may not merely deny the factual allegations adduced by the movant."[16] "If the movant puts in the record

that BVI removed Reddy from the boards of the Delaware entities by duly executed and delivered written consents on December 17, 2005. Thus, at the time of the self-serving December 24, 2005 resolutions, Reddy was no longer empowered to act as a director of Inc. or II Inc.

**12.** Court of Chancery Rule 56(c); *see also Acro Extrusion Corp. v. Cunningham,* 810 A.2d 345, 347 (Del.2002); *Williams v. Geier,* 671 A.2d 1368, 1375 (Del.1996).

**13.** *Cerberus Int'l Ltd. v. Apollo Mgmt., L.P.,* 794 A.2d 1141, 1150 (Del.2002).

**14.** *Tanzer v. Int'l Gen. Indus., Inc.,* 402 A.2d 382, 385 (Del.Ch.1979) (citing *Judah v. Delaware Trust Co.,* 378 A.2d 624, 632 (Del.1977)).

**15.** *Id.*

**16.** *Id.*

facts which, if undenied, entitle him to summary judgment, the burden shifts to the defending party to dispute the facts by affidavit or proof of similar weight."[17] Summary judgment will not be granted when the record reasonably indicates that a material fact is in dispute or "if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances."[18]

## III.

In this case, summary judgment in favor of the plaintiffs is appropriate because the two actions Reddy purported to take on August 23, 2005 were invalid and ineffective. First, Reddy lacked legal power, acting only as a director of Inc. and II Inc., to cancel the validly issued shares of those corporations registered in the name of BVI. That action could only be accomplished by validly adopted amendments to the certificates of incorporation of Inc. and II Inc. Second, the ten additional shares in Inc. and II Inc. Reddy purported to issue to himself are void or voidable for want of any valid consideration to those entities and must be disregarded in examining the sufficiency of the November 1, 2005 written consents and Reddy's removal as a director and officer of Inc. and II Inc. on December 17, 2005. No equitable considerations can change this result, even if the court could conclude the equities in this case favor the defendant.

These conclusions require the court to recognize BVI as the sole record stockholder of Inc. and II Inc. and similarly lead the court to conclude that Smith and Mukred were duly elected directors of Inc.

and II Inc. on November 1, 2005. Moreover, the court must conclude that Reddy was removed as a director of both entities on December 17, 2005 and, therefore, the resolutions passed by him on December 24, 2005 are nullities.

### A. Reddy's Cancellation Of The Shares Held By BVI Was Ineffective

■ At the time of the August resolutions, Reddy had no legal authority to cancel the common stock of Inc. and II Inc. Because Inc. and II Inc. received payment from BVI for those shares when the corporations were formed and those shares were not redeemable, BVI's shares could only be cancelled pursuant to the procedure outlined in 8 Del. C. § 242(a).[19] Reddy's version of exactly what he did to accomplish the cancellation is not entirely clear. He maintains that what he did was not a "redemption" of the existing stock, but rather the stock was cancelled and reissued. What he does not and cannot argue is that he effected amendments to either certificate of incorporation. Indeed, the very nature of a certificate amendment requires that the amendment be in writing, that it be authorized in writing by both the board of directors and the stockholders, and that it be filed with the Delaware Secretary of State. Because none of these conditions were ever met, the purported acts canceling BVI's shares in Inc. and II Inc. were nullities. The cancellation and reissuance of the 10 shares registered in BVI's name both being ineffective, BVI remained the record holder of 10 shares of each of Inc. and II Inc.

17. *Id.*

18. *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del.1962).

19. 8 *Del. C.* § 242(a) ("After a corporation has received payment for any of its capital stock, it may amend its certificate of incorpo-

ration ... and, if a change in stock or the rights of stockholders, or an exchange, reclassification, subdivision, combination or cancellation of stock or rights of stockholders is to be made, such provisions as may be necessary to effect such change, exchange, reclassification, subdivision, combination or cancellation.").

Turning to the effectiveness of the November 1 and December 17 written consents, the question, thus, becomes whether the 10 additional shares of Inc. and II Inc. Reddy issued to himself on August 23, 2005 were validly issued and entitled to vote at the time BVI executed them. If not, BVI was the owner of 100% of the shares authorized to vote when it acted to place Smith and Mukred on the Inc. and II Inc. boards and, later, to remove Reddy.

## B. The Stock Issued By Reddy Was Improperly Issued And Without Rights

Delaware law is replete with cases discussing the issue of whether stock without adequate consideration is void or voidable and it is fair to say that the result is not as clear as it could be.[20] The cases focus on stock issued for consideration below par value or the sale of treasury stock for inadequate consideration.[21] Other cases address stock issued for future services or other previously constitutionally inadequate consideration.[22] The modern trend

of the law is that "an issuance of stock without receipt by the company of valid consideration is void."[23] Here, as things stood on November 1, 2005 and December 17, 2005, the shares in question had been issued for no consideration at all to the corporation.

■ Whether the stock is void or voidable is frequently of no consequence. If the stock is voidable, the corporation normally has the right to void and cancel the shares. If the stock is void, that action is not necessary as the stock is usually considered void ab initio. Here, where the stock was still outstanding while BVI purported to appoint Smith and Mukred (and, later, remove Reddy), the distinction between void and voidable is potentially meaningful. This is largely because other cases have held that, in certain circumstances, voidable stock has voting rights.[24]

In the cases addressing stock issued below par value, there are two equitable considerations that render the stock voidable rather than void. The first consideration is the protection of third parties such as creditors.[25] If the stock was void ab

---

**20.** Contra, e.g., Belle Isle Corp. v. MacBean, 61 A.2d 699, 705 (Del.Ch.1948) (holding that "stock issued without consideration is voidable and not void in this state") (citing Finch v. Warrior Cement Corp., 141 A. 54 (Del.Ch. 1928)); see also Yasik v. Wachtel, 17 A.2d 309 (Del.Ch.1941); Bodell v. General Gas & Electric Corp., 132 A. 442 (Del.Ch.1926).

**21.** See, e.g., Byrne v. Lord, 1996 WL 361503 (Del.Ch. June, 11 1996) (treasury stock); Belle Isle Corp., 61 A.2d 699 (treasury stock); John W. Cooney Co. v. Arlington Hotel Co., 101 A. 879, 885 (Del.Ch.1917) (watered stock).

**22.** 8 Del. C. § 152; Legislative Synopsis to the 2004 Amendment to 8 Del. C. § 152 ("The amendment to Section 152 eliminates the requirement that the consideration paid for newly issued stock consist, either entirely or in part, of consideration in the form required by Section 3 of the Article IX of the Constitution of the State of Delaware of 1897, as amended."). The Constitution was contemporaneously amended to eliminate the consideration requirements of Section 3, Article IX.

See also, e.g., Triplex Shoe Co. v. Rice & Hutchins, 152 A. 342 (Del.1930) (no par stock issued for services); Bowen v. Imperial Theatres, Inc., 115 A. 918 (Del.Ch.1922) (fraudulent issuance of shares in consideration of services provided).

**23.** Fonds de Regulation et de Controle Café Cacao v. Lion Capital Mgmt., LLC, 2007 WL 315863, at *4 (Del.Ch. Jan. 22, 2007) (citing STAAR Surgical Co. v. Waggoner, 588 A.2d 1130, 1136 (Del.1991)).

**24.** See Byrne, 1996 WL 361503, at *4 (finding on a motion to dismiss that "the key question in determining whether BAI had the right to vote the BAI Shares is whether the stock is void or voidable").

**25.** DuPont v. Ball, 106 A. 39, 44 (Del.1918); accord Scully v. Automobile Finance Co., 109 A. 49, 53 (Del.Ch.1920) ("The distinction drawn is between declaring the issue of stock to be void and declaring that the contract to issue stock without statutory consideration is unlawful and void, the latter leaving unim-

*initio,* a creditor could not sue the stockholder for the difference between the par value and the consideration actually paid, rendering meaningless the assessment to the stockholder for the deficiency under 8 *Del. C.* § 162. The second consideration is the protection of the stockholder. If equity so requires, the stockholder can make additional payment up to par value and legally own the stock.[26] Neither situation is present here.

Likewise, under the older case law, where stock was issued for consideration that did not fall within the constitutional limitations, other equities allowed for the treatment of the stock as voidable rather than void. For example, under the prior law, a valid form of consideration was services rendered, but not future services.[27] If the services were not rendered before the corporation became insolvent, the creditors could levy against the stockholders for the value required. Without the ability to levy against the stockholders, when stock was issued for future consideration never rendered due to insolvency, the stock would truly be "bonus stock" issued without any consideration at all. These situations are not present here, as no future consideration was to flow to the corporations.

Another potential equitable consideration is found where the stock has been transferred to a "protected purchaser" under the Uniform Commercial Code.[28] In that case, the third party has protections from personal claims against the original holder, such that if the stock is only voidable the protected purchaser exception may still apply.[29] This conclusion is supported by the same policy considerations that protect creditors from watered stock. Third parties without knowledge of the defect in the stock should be permitted to rely on what appears to be validly issued stock.[30] Here, again, this is not the case, as Reddy did not sell or transfer his stock to anyone else.

In 2004, with the revisions to section 152, the legislature expanded the definition of consideration to include "any benefit to the corporation."[31] When this broad definition is combined with the widespread use of no par stock, stock issued for no consideration of any kind—i.e. no benefit to the corporation—is one of the limited number of circumstances likely to fall under the void versus voidable dichotomy. This case is one of those circumstances. The stock in question was issued for no consideration to the corporation and is still held by its original holder.[32]

Reddy, as the sole, self-interested director, granted himself stock in the corpo-

paired the obligation to pay for the stock when and as required by the corporation, or when needed to pay creditors.").

**26.** *Highlights for Children, Inc. v. Crown,* 227 A.2d 118, 122 (Del.Ch.1966).

**27.** *Cooney,* 101 A. at 888 ("By a strict construction 'work done' does not include work to be done, or work done and to be done.").

**28.** *6 Del. C.* § 8–303(a).

**29.** *Clark v. Airavada Corp.,* 12 F.Supp.2d 1114, 1120 (D.Nev.1998) (holding where stock was issued for future services in violation of constitutional consideration requirements, but par value was paid, that the "stock was voidable, not void, because [the initial purchaser] paid valid consideration for the

stated capital, but invalid consideration for the remainder").

**30.** The court's decision in the present case is limited to the facts. Consistent with existing case law, under different circumstances equitable considerations may require stock issued without consideration to be treated as voidable rather than void. This is particularly the case when the stock was transferred to a protected purchaser under 6 *Del. C.* § 8–302–03. Since Reddy did not transfer the stock to any third party, the issue is not before the court and the court, does not opine on it.

**31.** *8 Del. C.* § 152.

**32.** *Cf.* RODMAN WARD, EDWARD P. WELCH, & ANDREW TUREZYN, FOLK ON THE DELAWARE GENERAL CORPORATION LAW, § 152.5 n. 44 (5th ed.) ("Al-

rations in return for a promise to pay Baarma's designees rather than the corporations. At the time of the August resolutions, no consideration was to flow to the corporations, either immediately or in the future. There are no third parties—creditors, transferees, or otherwise—to protect. This case is simply a matter, analogous to contract law, where the issuance is unenforceable for want of any consideration. The complexities and intricacies of the cases involving third parties, watered stock, treasury stock issued without valid consideration, and constitutionally inadequate consideration simply are not relevant where a self-interested party acting as the sole director of a 100% owned subsidiary issues himself stock without any consideration to the subsidiary as part of a plan to wrest majority control from the parent.

Here, there are no equities or other considerations requiring the stock issued to be treated as voidable such that it would carry voting rights as was the case in *Byrne*.[33] The court concludes Reddy's stock is at the least voidable, if not totally void, and was not entitled to vote as of the times BVI acted by written consent to appoint Smith and Mukred and to remove Reddy.[34]

## C. *The Written Consents Adding Smith And Mukred To The Boards and Removing Reddy Were Proper*

In light of the foregoing, the court concludes that BVI remained the sole stockholder of all the voting shares of Inc. and II Inc. as of November 1, 2005. Thus, BVI held the power to act by written consent when it added Smith and Mukred to the boards of Inc. and II Inc. on November 1, 2005 and when it removed Reddy as a director on December 17, 2005. As of November 1, Reddy was no longer the sole director of the Delaware corporations, but rather one of three. BVI further exercised its consent power and removed Reddy as a director of Inc. and II Inc. on December 17, 2005. Thus, the December 24, 2005 resolutions signed by Reddy are nullities and Reddy's later payment of cash to Inc. and II Inc. is of no consequence in judging the status of the shares Reddy issued to himself. Those shares remain defective and, upon application of BVI, Inc. and II Inc., must be cancelled.

## D. *Non–Compliance With The Delaware General Corporation Law Is Not Excused*

■■■ Reddy maintains that Baarma was the equitable owner and had total discretion to run Inc. and II Inc. as he saw fit. In these circumstances, it may seem a mere technicality that the consideration was to flow to Baarma's personal interests rather than to the corporations. Technicalities, however, are vital in transactions that affect the corporate form.[35] Indeed, the issuance of stock is an act of fundamental significance under Delaware law having a direct affect on the ownership

---

though section 153 was substantially revised in 2004 [to expand the definition of consideration], nowhere in the amended statute, nor the legislative synopsis of the 2004 amendments, is the issue of the effect of the issuance of stock without valid consideration addressed.")

**33.** 1996 WL 361503, at *4 (denying motion to dismiss because in that procedural posture it could not be determined whether stock was void rather than voidable).

**34.** 8 *Del. C.* § 152–53; *Rice & Hutchins v. Triplex Shoe Co.*, 147 A. 317, 321 (Del.Ch. 1929), *aff'd*, 152 A. 342 (Del.1930) (finding that where stock was issued for invalid consideration by directors to themselves, "[s]uch stock had no right to vote").

**35.** *STAAR Surgical*, 588 A.2d at 1136 (finding an "attempt to trivialize the unassailable facts of this case as mere 'technicalities' is wholly unpersuasive").

and control of Delaware entities.[36] The law therefore requires certainty and precision in such matters.[37]

■ The Delaware Supreme Court has stated that "courts must act with caution and restraint when granting equitable relief in derogation of established principles of corporate law."[38] Here, the oral agreement between Baarma and Reddy regarding the share issuances, as effectuated by Reddy in August 2005, contemplated a legally voidable act. Reddy's actions based on that oral agreement resulted in an unenforceable agreement. The alleged oral agreement amounts to a legally void act and "[n]either logic nor equity compel the validation of a legally void act."[39]

### E. Rescission Of The Oral Agreement And Cancellation Of Reddy's Stock

■■ Having found that the implementation of the oral agreement between Baarma and Reddy is a legal nullity, the court now turns to the proper remedy. Under established Delaware Supreme Court precedent, when the issued stock is void, "cancellation is the proper remedy."[40] Here, the court need not determine whether the stock issued is void or merely voidable. By filing this action, the plaintiffs have made clear their intent to cancel Reddy's shares and for BVI to maintain 100% ownership of Inc. and II Inc. Normally, the stockholders of a corporation can ratify a voidable act.[41] Here, BVI has chosen not to do so. Therefore, Reddy's stock in Inc. and II Inc. must be cancelled and all monies paid by him for those shares must be returned.[42]

In light of fact that Reddy's has only a 25% interest in BVI, he resigned as a director of BVI on October 31, 2005,[43] and he has no interest, of record or equitable, in the Delaware entities, summary judgment must be granted to the plaintiffs on their claims. BVI, as the rightful 100% holder of the stock of Inc. and II Inc., was entitled to elect or remove the corporations' directors and has properly done so. Reddy is free to pursue any remaining claims he may have under the alleged oral agreements. At this stage of the litigation, the court grants summary judgment in conformity with the rulings in this opinion.

### F. Attorneys' Fees

■ The plaintiffs seek attorneys' fees in this action. While the award of attorneys' fees is "unusual" relief,[44] the

---

**36.** Id. ("The issuance of corporate stock is an act of fundamental legal significance having a direct bearing upon questions of corporate governance, control and the capital structure of the enterprise.").

**37.** Id. ("Stock issued without authority of law is void and a nullity.").

**38.** Id. at 1137, n. 2 (citing Alabama By–Products Corp. v. Neal, 588 A.2d 255, 258 (Del. 1991)).

**39.** Id.

**40.** Id. at 1137 (citing Diamond State Brewery, Inc. v. De La Rigaudiere, 17 A.2d 313, 318 (Del.Ch.1941)); but see Scully, 109 A. at 54 ("The position of the complainants that no lawful consideration was given for the shares of common stock was adopted by me, but for the reason which I have stated I do not agree that I should adjudge that they should be cancelled, as prayed for by the complainants.").

**41.** Michelson v. Duncan, 407 A.2d 211, 219 (Del.1979) ("It is the law of Delaware, and general corporate law, that a validly accomplished shareholder ratification relates back to cure otherwise unauthorized acts of officers and directors.").

**42.** The new shares issued to Bin Mahfouz are also cancelled, but BVI retains the 10 shares it originally had.

**43.** Reddy Dep. 9–10, 304.

**44.** Barrows v. Bowen, 1994 WL 514868, at *2 (Del.Ch. Sept. 7, 1994) (citing Weinberger v.

Court of Chancery has broad discretion in making such awards.[45] Delaware courts follow the American Rule.[46] Under the American Rule, litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys' fees, which, in equity, may be awarded at the discretion of the court.[47] However, there are several recognized exceptions to the American Rule.[48] One exception is where the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," the court will award attorneys' fees to "deter abusive litigation in the future, thereby avoiding harassment and protecting the integrity of the judicial process." [49] The award of attorneys' fees is based on an individualized inquiry into the facts presented.[50]

While the court finds that Reddy's stock issuance was improper, there is insufficient evidence that this case was conducted in bad faith.[51] The facts not in dispute establish that Reddy did not inform anyone of the oral agreements, apparently in large part to secure recognition of his 25% interest in BVI and the favorable $6.1 million settlement with Baarma's estate. In all likelihood, Reddy did have a fiduciary duty to disclose this, yet his actions do not rise to the level of bad faith necessary for an award of attorneys' fees. Reddy has made no frivolous claims, he has not unnecessarily prolonged the litigation, his positions, though often less that definite, did not change in their underlying legal significance, and he has not been shown to have been made knowingly false claims or otherwise misled the court. Reddy has simply engaged in sharp tactics to secure what he believed was rightfully his.[52] This, standing alone, is insufficient to warrant attorneys' fees. Under the facts adduced on the summary judgment record, nothing Reddy has done merits a departure from the American Rule. There-

U.O.P., Inc., 517 A.2d 653, 656 (Del.Ch. 1986)).

**45.** Kaung v. Cole Nat. Corp., 884 A.2d 500, 506 (Del.2005) (citing Johnston v. Arbitrium (Cayman Islands) Handels AG, 720 A.2d 542, 547 (Del.1998)); Wilmington Medical Center v. Severns, 433 A.2d 1047, 1049–50 (Del. 1981); Bodley v. Jones, 65 A.2d 484, 486 (Del.1948); 10 Del. C. § 5106.

**46.** Brice v. State, 704 A.2d 1176, 1178 (Del. 1998).

**47.** Johnston, 720 A.2d at 545; Beck v. Atlantic Coast PLC, 868 A.2d 840, 850 (Del.Ch.2005) (citing Barrows, 1994 WL 514868, at *1).

**48.** Goodrich v. E.F. Hutton Group, Inc., 681 A.2d 1039, 1043–44 (Del.1996).

**49.** Brice, 704 A.2d at 1178 (quoting Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) and Schlank v. Williams, 572 A.2d 101, 108 (D.C.1990)).

**50.** Beck, 868 A.2d at 851 ("There is no single standard of bad faith that warrants an award of attorneys' fees in such situations; rather, bad faith is assessed on the basis of the facts presented in the case. Courts have found bad faith conduct where parties have unnecessarily prolonged or delayed litigation, falsified records, or knowingly asserted frivolous claims. Specific behavior that has been found to constitute bad faith in litigation includes misleading the court, altering testimony, or changing position on an issue.") (citations omitted).

**51.** Because the agreement and resolutions are legal nullities, the court does not need to reach the fraud or breach of fiduciary duty arguments raised by the plaintiffs.

**52.** Barrows, 1994 WL 514868, at *2 ("While this court can imagine situations which may be so egregious as to warrant an award of attorney's fees on the basis of fraud, the American Rule would be eviscerated if every decision holding defendants liable for fraud or the like also awarded attorney's fees. Even more harmful would be to extend this narrow exception to situations involving less than unusually deplorable behavior.").

fore, the plaintiffs' claim for attorneys' fees is denied.

## IV.

For the reasons set forth herein, summary judgment will be entered in favor of the plaintiffs. The plaintiffs are directed to submit a form of order in conformity with this opinion, on notice, within 10 days.