Jagan M. REDDY, Defendant Below, Counterclaim Plaintiff Below, and Third–Party Plaintiff Below, Appellant,

v.

MBKS COMPANY LIMITED, a British Virgin Islands company, MBKS Inc., a Delaware corporation, and MBKS II Inc., a Delaware corporation, Plaintiffs Below, Counterclaim Defendants Below, and Counterclaim Nominal Defendants Below, Appellees,

and

Abdul–Elah A. Mukred, and Lawrence G. Smith, Third–Party Defendants Below, Appellees.

No. 300, 2007.

Supreme Court of Delaware.

Submitted: Dec. 12, 2007.
Decided: March 3, 2008.

Kathleen M. Miller and Joelle E. Polesky (argued), Esquires, of Smith, Katzenstein & Furlow, LLP, Wilmington, Delaware; for Appellant.

Arthur G. Connolly, III and Henry E. Gallagher, Jr., Esquires, of Connolly, Bove, Lodge & Hutz LLP, Wilmington, Delaware; Of Counsel: Peter J. Kahn and

Edward C. Reddington (argued), Esquires, of Williams & Connolly LLP, Washington, D.C.; for Appellees.

Before HOLLAND, BERGER and JACOBS, Justices.

JACOBS, Justice:

 Jagan M. Reddy ("Reddy"), the defendant below, appeals from an order of the Court of Chancery granting summary judgment in favor of the plaintiffs below, MBKS Company Limited, a British Virgin Islands corporation ("BVI"), and its subsidiaries, MBKS Inc. and MBKS II Inc., both Delaware corporations (the "MBKS companies").[1] The legal issue presented on this appeal is whether the Court of Chancery correctly determined that certain actions by Reddy constituted a cancellation of shares of the MBKS companies. The Court of Chancery held that they did, and that because the charters of those companies had not been amended to authorize that alteration of their capital structure, Reddy's actions were legally ineffective. As a consequence, the Court of Chancery determined that BVI remained the 100% owner of both MBKS companies. We hold that the Court of Chancery properly granted summary judgment to the plaintiffs, and affirm.

### FACTS [2]

In late 1995, BVI formed two Delaware subsidiary corporations, the MBKS companies, as vehicles to acquire two apartment complexes in Colorado. At that time, BVI

---

1. MBKS Inc. and MBKS II Inc. are treated identically for purposed of this appeal because all actions taken were identical with respect to each.

2. The material undisputed facts are derived from the Court of Chancery's summary judgment opinion. *See MBKS Co. Ltd. v. Reddy,* 924 A.2d 965 (Del.Ch.2007). On appeal from the Court of Chancery's decision to grant

summary judgment, "[t]his Court's review is '*de novo,* not deferential, both as to the facts and the law ... The facts of record, including any reasonable hypotheses or inferences to be drawn therefrom, must be viewed in the light most favorable to the non-moving party'" (which is Reddy). *Williams v. Geier,* 671 A.2d 1368, 1375–76 (Del.1996) (internal citations omitted).

owned ten (10) shares in each MBKS company and was the 100% record owner of both. In turn, the 100% record stockholder of BVI was Sultan Khalid Bin Mahfouz ("Bin Mahfouz"). Reddy was a personal employee of Bin Mahfouz's cousin, Sami Baarma ("Baarma").[3]

At the core of this dispute are certain oral agreements that Reddy and Baarma made before Baarma died on March 12, 2005. The Court of Chancery assumed (and no one here disputes) that those oral agreements were, in fact, made. Reddy and Baarma conducted their business substantially on the basis of oral agreements and mutual trust, as evidenced by a nearly complete lack of formal documentation of various transactions involving the MBKS companies.

### A. The 1996 "Share Purchase Agreement" As Later Modified

In 1996, Reddy and Baarma agreed that, in exchange for making a capital contribution, Reddy would receive an equity interest in both MBKS companies. Reddy's contribution was intended to finance the acquisition of a third apartment building in Colorado. The record contains two sets of resolutions of the MBKS companies that reflect this "share purchase agreement." The original resolutions—signed by Baarma and Reddy but undated—authorize the sale to Reddy of 3.4 shares of each MBKS company at a price of $200,000 per share. A second set of resolutions, produced by Reddy, consisted of copies of the original resolutions that were dated May 20, 1996 and contained two modifications that Reddy had handwritten and initialed. Specifically, the number of shares of each MBKS company to be issued to Reddy was increased from 3.4 to 10 shares, and the per

share consideration was decreased from $200,000 to $68,000 per share. Although Baarma did not sign or initial those changes, Reddy asserts that Baarma consented to the modifications, but provides no explanation for why those changes were made. In any event, under both the original and the modified resolutions, the total consideration Reddy would pay for his stock in each MBKS company was $680,000. The only substantive difference between the two sets of resolutions is the increase in the number of shares Reddy would receive in exchange for that total consideration.

Those resolutions, as drafted, were not implemented. That is, Reddy did not pay any cash consideration to the MBKS companies for the shares because (he claims) at some point in 1997, it became apparent that additional capital infusions were not needed. As a result (Reddy further claims), he and Baarma orally modified the (previously modified) resolutions, with the result that Reddy would receive 10 shares in each MBKS company, but would pay the cash consideration not to the MBKS companies, but instead to certain persons to be named by Baarma. Those persons would include Baarma's mistresses and household staff. According to Reddy, the payments would be made on Baarma's death and were structured in this manner in order to circumvent the estate administration process.

Baarma died in March 2005. But, Reddy paid no monies to Baarma's designees, despite his earlier agreement to do so. The reason, Reddy claims, is that it was "impossible" to make payments to Baarma's designees, so instead he made the payments to the MBKS companies, in

---

**3.** Reddy contended, and the Court of Chancery assumed for summary judgment purposes, that because most of the start-up capital for BVI and its two subsidiaries had been furnished by a Baarma-owned entity, Baarma (not Bin Mahfouz) was the beneficial owner of BVI.

2006. Although Reddy made payments totaling $1,360,000 to the MBKS companies, he did that only after this lawsuit had been brought against him in the Court of Chancery by BVI and the MBKS companies.

## B. *The 1996 "Distribution Agreement"*

In order for this narrative to be complete, another agreement, also entered into in 1996, is critical. Reddy claims that, in addition to the 1996 "share purchase agreement" described above, he and Baarma entered into a separate oral agreement (the "distribution agreement"). This separate agreement was that if a United States citizen ever became a record shareholder of BVI, then BVI would distribute proportionately all its shares in the two MBKS companies to its (BVI's) stockholders. Reddy claims that this "distribution agreement" was entered into for tax reasons. The "distribution agreement" was never reduced to writing and it was never disclosed to anyone else, including Bin Mahfouz, who was one of BVI's two directors. Not until October 2005 did Reddy inform Bin Mahfouz that this agreement existed. The significance of the timing of that nondisclosure will soon appear.

According to Reddy, the 1996 "distribution agreement" remained dormant until it sprang to life in 2005, when Reddy first became a BVI record shareholder.[4] After Baarma's death in March 2005, Reddy began negotiating with Bin Mahfouz (who knew nothing of the 1996 "distribution agreement"), seeking Bin Mahfouz's formal recognition of Reddy's stock ownership interest in BVI. Reddy's claimed equity interest in BVI was premised on certain investments he made in 1996 in connection with BVI's initial purchase (through the MBKS companies) of the Colorado properties. The result of these negotiations was reduced to written reso-

lutions signed by Reddy and Bin Mahfouz (who were BVI's only directors) on April 7, 2005. Those resolutions recognized Reddy as the owner of a 25% interest in BVI, retroactive to October 21, 1994. Reddy's 25% ownership in BVI is not contested in this litigation. What is contested is Reddy's claim that he also owns a 62.5% stock interest in the MBKS companies, by virtue of the 1996 "share purchase agreement" as modified, and the 1996 "distribution agreement."

## C. *The August 2005 Resolutions Implementing The Share Purchase and The Distribution Agreements*

On August 23, 2005, Reddy, acting as the sole director of the MBKS companies, unilaterally adopted resolutions that (he claims) implemented his 1996 agreements with Baarma. Those August 2005 resolutions—which contain various "whereas" clauses that purport to explain Reddy's actions and to state his version of the undocumented agreements with Baarma—recite that:

> During fourth quarter 1995 and first quarter 1996 [ ... ] it was further agreed between [Baarma] and [Reddy] that, under certain circumstances, [Reddy] would be issued stock amounting to 25% of the transaction. With the unexpected and premature death of [Baarma] on March 12, 2005, which was a special circumstance, a April 7, 2005 resolution of the Board of Directors of [BVI] gave [Reddy] a 25% ownership in the company as of October 21, 1994.

> Pursuant to an agreement between [MBKS] and [BVI] that required the shares of [BVI][sic] to be held by [BVI's] shareholders if a U.S. citizen was a shareholder of [BVI], [Reddy] has now decided, for tax reasons, to own the

---

4. Reddy is a United States citizen; Bin Mahfouz and Baarma were not.

[MBKS] shares directly and not via [BVI].

About May 20, 1996 the Directors of [MBKS] approved the purchase by [Reddy] of 10 shares of [MBKS]. [ ... ]

> Resolved that [Reddy] be granted 10 shares of MBKS, diluting the ownership of [BVI].

> Resolved that the 10 shares held by [BVI in MBKS] be reissued in the names of the shareholders of [BVI]. Therefore, 7.5 shares will be held in the name of [Bin Mahfouz] and [Reddy] will hold 2.5 shares.[5]

Purporting to implement the first resolution (which is claimed to reflect the 1996 "share purchase agreement" as modified), Reddy caused the MBKS companies to issue, to himself, certificates for 10 additional shares of each MBKS company. Purporting to implement the second resolution (which is claimed to reflect the 1996 "distribution agreement"), Reddy wrote the word "cancelled" across the two certificates evidencing BVI's ownership interest in each MBKS company. He then caused each MBKS company to issue new certificates to Bin Mahfouz (for 7.5 shares) and to himself (for 2.5 shares). Based upon those actions, Reddy claims that BVI no longer has any interest in the MBKS companies, and that Bin Mahfouz has a 37.5% stock ownership interest, and that he (Reddy) has a 62.5% ownership interest, in the MBKS companies.

Reddy did not immediately inform Bin Mahfouz that he had adopted these August 2005 resolutions. The reason is that at that time, Reddy and his family were negotiating a settlement with Bin Mahfouz and others relating to Reddy's claim of entitlement to a portion of Baarma's estate. Ultimately, in October 2005, Reddy and Bin Mahfouz agreed that Reddy would receive a $6.1 million settlement. Only after Reddy received the settlement proceeds did he then inform Bin Mahfouz of the 1996 "share purchase" and "distribution" agreements, and of the August 2005 resolutions purporting to implement these agreements.

On November 1, 2005, in response to Reddy's opportunistic disclosure of those facts, Bin Mahfouz caused BVI to execute written consents electing Abdul–Elah A. Mukred ("Mukred") and Lawrence G. Smith ("Smith") to the boards of directors of the MBKS companies. Next, on December 17, 2005, BVI executed a second set of written consents, removing Reddy from the boards of directors of the MBKS companies.

### D. *The Court of Chancery Litigation*

On December 20, 2005, BVI and the MBKS companies filed an action in the Court of Chancery, seeking a declaratory judgment and other relief against Reddy for alleged breaches of fiduciary duty, fraud, negligent misrepresentation, and other misconduct. Reddy counterclaimed for a declaratory judgment confirming his claimed 62.5% ownership interest in the MBKS companies, and for a determination of those companies' lawful directors under 8 *Del. C.* § 225. In his counterclaim, Reddy named Mukred and Smith as third-party defendants. Thereafter, the plaintiff corporations moved for summary judgment on all of their claims. Opposing that motion, Reddy challenged the legality of his removal on December 1, 2005 as a director of the MBKS companies, and also of the legal sufficiency of BVI's November 1, 2005 written consents appointing Smith and Mukred as directors of the MBKS companies. Reddy did not, however,

---

**5.** The resolutions are identical other than one is for MBKS, Inc. and the other for MBKS II, Inc.

cross-move for summary judgment on his counterclaims and third-party claims.

The Court of Chancery granted summary judgment in favor of the plaintiffs and against Reddy on the plaintiffs' claims, concluding that the actions recited in Reddy's August 2005 resolutions were legally ineffective. The Vice Chancellor reasoned that insofar as the August 2005 resolutions purported to implement the 1996 "distribution agreement"—by canceling the shares held by BVI in the two MBKS companies and issuing new shares to Reddy and Bin Mahfouz—an amendment to the certificates of incorporation of both MBKS companies was required and had not occurred. Moreover, insofar as the August 2005 resolutions purported to implement the amended 1996 "share purchase agreement"—by issuing 10 additional shares to Reddy in each MBKS company—those issued shares were "void or voidable" for lack of consideration, and, accordingly, had no voting rights. As a result, the Court of Chancery concluded that the November and December 2005 written BVI consents adding Smith and Mukred to, and removing Reddy from, the boards of the MBKS companies were legally valid.[6]

This appeal followed.

### ANALYSIS OF THE CLAIM OF ERROR

■ This Court reviews a grant of summary judgment *de novo*.[7] The Court also reviews *de novo* the trial court's for-mulation and application of legal principles.[8]

■ Reddy's sole claim on appeal is predicated upon the 1996 "distribution agreement." The Court of Chancery characterized Reddy's actions purporting to implement the 1996 "distribution agreement" as a cancellation of BVI's shares in the MBKS companies. Such a change in the corporate capital structure, the Vice Chancellor concluded, could only be accomplished by a charter amendment pursuant to 8 *Del. C.* § 242.[9] Reddy contends that these rulings by the Court of Chancery are erroneous as a matter of law.

Reddy claims that his actions did not require a Section 242 charter amendment, because they amounted only to a cancellation of share *certificates* (as distinguished from the underlying *shares*), in order to effectuate the transfer of ownership that had previously occurred by reason of the 1996 "distribution agreement." To say it differently, Reddy claims that his August 2005 actions did not alter that capital structure, but merely reallocated ownership interests within the existing capital structure of the MBKS companies.

We pause first to consider a threshold argument, advanced by Appellees, that this Court should not consider Reddy's claim, because during the Court of Chancery proceedings, Reddy repeatedly characterized his August 2005 actions as a cancellation of stock, not of stock certifi-

---

6. *MBKS Co. Ltd. v. Reddy*, 924 A.2d 965 (Del. Ch.2007).

7. *Emerald Partners v. Berlin*, 726 A.2d 1215, 1219 (Del.1999) (citing *Arnold v. Society for Savings Bancorp, Inc.*, 650 A.2d 1270, 1276 (Del.1994)).

8. *Id.* at 1224 (Del.1999) (citing *Gilbert v. El Paso Co.*, 575 A.2d 1131, 1142 (Del.1990)).

9. 8 *Del. C.* § 242 relevantly states: "(a) After a corporation has received payment for any of its capital stock, it may amend its certificate of incorporation [ ... ] so long as its certificate of incorporation as amended would contain [ ... ] if a change in stock or the rights of stockholders, or an exchange, reclassification, subdivision, combination or *cancellation of stock or rights of stockholders* is to be made, such provisions as may be necessary to effect such change, exchange, reclassification, subdivision, combination or cancellation." (emphasis added).

cates as he now claims. But, Reddy accurately points out that, at the Court of Chancery level, neither side ever referred to Section 242 or advocated how Reddy's actions should be characterized with reference to that statute. The likely reason is that the focus of the Chancery proceedings was upon whether or not Reddy had breached his fiduciary (as distinguished from statutory) duties by adopting the August 2005 resolutions.

■ It is apparent to us that the issue presented on this appeal was never "fairly presented" to the trial court, as Supreme Court Rule 8 requires.[10] But, it does not necessarily follow, in this specific case, that we should not consider the issue. In his written opinion, the Vice Chancellor held *sua sponte* that Reddy's actions constituted an attempted cancellation of shares that required a charter amendment under Section 242. Because the parties were not heard on this specific issue, it serves the "interests of justice" for us to consider Reddy's claim, as Supreme Court Rule 8 permits.[11]

We turn to the merits of Reddy's position, which is that (i) a transfer of the shares of both MBKS companies from BVI to BVI's shareholders had been validly agreed to in the 1996 "distribution agreement" and (ii) that agreement was validly implemented by Reddy's August 2005 resolutions. Reddy claims that his 2005 resolutions should be regarded as nothing more than ministerial steps to implement the 1996 "distribution agreement." We agree that Reddy's actions might be regarded as "ministerial," but only if there was a preexisting valid and enforceable agreement for BVI to transfer its MBKS shares to its shareholders in the event that a U.S. citizen ever became a BVI shareholder. It is upon this premise, however, that Reddy's case founders. Viewing the facts in the light most favorable to the non-moving party below (Reddy), we find that Reddy failed to make a *prima facie* showing, sufficient to defeat summary judgment, that the 1996 "distribution agreement" was a preexisting valid and enforceable agreement to transfer the MBKS companies' shares.[12]

Even under Reddy's version of the facts, the 1996 "distribution agreement" was negotiated by Reddy and Baarma without the knowledge or involvement of Bin Mahfouz (BVI's other director). Reddy testi-

---

**10.** *As a result, the terminology that both parties and their counsel used at the Court of Chancery level is at times inconsistent with their positions on this appeal. On the one hand, although Reddy now maintains that his actions constitute a mere cancellation of stock* certificates *(not shares), Reddy's legal pleadings repeatedly referred to his actions as canceling "stock"* (e.g. *Brief in Opposition to Motion for Summary Judgment, at 41, 59, 60; Answer, at 3, 20–24, 31; Counterclaim and Third Party Claim, at 12, 24, 33). On the other hand, although Appellees now argue that Reddy's actions represent a cancellation of* stock, *they nevertheless sometimes referred to the 1996 "distribution agreement" as effecting a "transfer" of ownership interest, as distinguished from changing the capital structure of the MBKS companies* (e.g. *Opening Brief in Support of Motion for Summary Judgment, at 24, 35; Transcript of Oral Argu-*ment before the Court of Chancery, March 19, 2007, at 52).

**11.** *See* Sup.Ct. R. 8.

**12.** For purposes of deciding the summary judgment motion, the Court of Chancery "assume[d] that the oral agreements on which Reddy claims to rely did in fact exist as he claims." *MBKS Co. Ltd. v. Reddy,* 924 A.2d 965, 968 (Del.Ch.2007). The Court of Chancery did not determine, however, the validity or the enforceability of the 1996 "distribution agreement." Although the Vice Chancellor noted that the 1996 "share purchase agreement" was a "legally voidable act" and, thus, "unenforceable," the Vice Chancellor did not make a similar explicit finding with respect to the 1996 "distribution agreement." *Id.* at 976.

fied that during the "negotiation" of that agreement, Baarma acted on behalf of the MBKS companies, and Reddy acted on behalf of BVI.[13] Reddy claims that BVI (as represented by himself) "consented" to the "distribution agreement." We disagree and, for the reasons next discussed, hold that Reddy's "consent" on behalf of BVI was legally ineffective.

■ Reddy did not inform, or obtain the approval of, the other BVI director (Bin Mahfouz) when he "negotiated" the "distribution agreement" with Baarma in 1996. Indeed, Reddy never informed Bin Mahfouz about the existence of the "distribution agreement" until after Reddy concluded his settlement with Bin Mahfouz nearly 10 years later. Nor did Reddy present any record evidence that BVI had granted Reddy legal authority to approve that agreement unilaterally on BVI's behalf. If the "distribution agreement" is viewed as an agreement to transfer shares, as Reddy claims, then BVI must be deemed the transferor, and Reddy and Bin Mahfouz must be deemed the transferees. Reddy has failed to show how an agreement to transfer shares to which the board of directors of the transferor (BVI) never

validly consented can be legally enforceable.[14] Therefore, Reddy did not discharge his burden to prove that the 1996 "distribution agreement," even as he describes it, was a valid enforceable agreement to transfer shares from BVI to BVI's shareholders.[15]

Because there was no legally valid agreement to transfer shares requiring implementation, Reddy's actions in August 2005 were not ministerial cancellations of stock certificates, i.e., a reallocation of shares within the existing capital structure of the MBKS companies. Those actions, if they amounted to anything at all, could only have represented an effort to change the capital structure of those companies. The Court of Chancery correctly concluded that Reddy's actions in August 2005—allegedly performed on behalf of the issuers of the shares (the MBKS companies)[16] and involving 100% of the common stock of each issuer—amounted to a cancellation of stock followed by the issuance of new shares to different shareholders. The cancellation of those shares could only be accomplished by complying with the procedure mandated by 8 Del. C. § 242—a written charter amendment, authorized by

13. Jagan M. Reddy, Transcript of Deposition, May 10, 2006, at 133–135.

14. Shares of issued stock belong to the stockholders, not to the issuing corporation. See 8 Del. C. § 159 ("The shares of stock in every corporation shall be deemed personal property and transferable as provided in Article 8 of subtitle I of Title 6."); See also Salt Dome Oil Corp. v. Schenck, 41 A.2d 583, 587 (Del.1945) (noting that shares of stock are personal property).

15. Although it is not essential to our analysis, even if Reddy had the authority to unilaterally approve the "distribution agreement" on BVI's behalf, that agreement would be unenforceable in equity. Baarma was one of the two directors of the MBKS companies (the other director being Reddy) and Reddy was one of the two directors of BVI (the other

director being Bin Mahfouz). As a result, Reddy stood on both sides of the transactions and had the burden of making a prima facie showing that the "distribution agreement" was fair to BVI. Because the "distribution agreement" is presumed to be unfair to BVI unless Reddy can show otherwise and Reddy failed to satisfy his burden (the August 2005 resolutions elliptically indicate that the distribution was done "for tax reasons"), the agreement is void on this basis as well. See, e.g., Nixon v. Blackwell, 626 A.2d 1366, 1378 (Del. 1993) (scrutinizing the fairness of a self-interested corporate transaction); 8 Del. C. § 144.

16. Reddy admitted in response to an interrogatory that "he was acting in his capacity as sole director of [the MBKS companies]" when he "cancelled [BVI]'s 100% nominal interest in [the MBKS companies] on August 23, 2005."

the board of directors, approved by the shareholders, and filed with the Delaware Secretary of State. Reddy concedes that those requirements are applicable to cancellations of stock, and that no charter amendment for either MBKS company was ever effected.

## CONCLUSION

For the foregoing reasons, the order of the Court of Chancery granting summary judgment to the Appellees is affirmed.