# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NSI-MI HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **C.A. No. N22C-08-489** |
| | ) | **PRW CCLD** |
| AMETEK, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: August 14, 2023
Decided: November 13, 2023

*Upon Plaintiff's Motion for Summary Judgment,*
**GRANTED in part, DENIED in part.**

## MEMORANDUM OPINION AND ORDER

Katharine L. Mowery, Esquire, Dorronda Bordley, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; David W. Long-Daniels, Esquire (*argued*), M. Allyson Lumpkin, Esquire, Ansley K. Fantaski, Esquire, SQUIRE PATTON BOGGS (US) LLP, Atlanta, Georgia, *Attorneys for Plaintiff NSI-MI Holdings, LLC*.

Joanna J. Cline, Esquire (*argued*), Emily L. Wheatley, Esquire, TROUTMAN PEPPER HAMILTON SANDERS LLP, Wilmington, Delaware, Michael S. Hino, Esquire, TROUTMAN PEPPER HAMILTON SANDERS LLP, Berwyn, Pennsylvania, *Attorneys for Defendant AMETEK, Inc.*

**WALLACE, J.**

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. THE MIPA AND THE ESCROW AGREEMENT

In March 2021 Plaintiff NSI-MI Holdings, LLC and Defendant AMETEK, Inc., entered into a membership interest purchase agreement (the "MIPA").[1] Via the MIPA, AMETEK purchased all NSI-MI's issued and outstanding LLC membership interests.[2]

At the time of that purchase, NSI-MI agreed to indemnify AMETEK for certain losses.[3] Relevant to the present motion, MIPA Section 7.02 provides that NSI-MI shall indemnify and hold harmless AMETEK and its affiliates "from and against, any and all Losses incurred or sustained by, or imposed upon, [AMETEK or its affiliates] based upon, arising out of, with respect to or by reason of: . . . (g) the Raytheon Matter (as defined in Section 3.09(b) of the Disclosure Schedules)."[4] "Loss" is defined as "all losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees (whether incurred in connection with third party or first

---

[1] *See* Plaintiff NSI-MI Holdings, LLC's Opening Brief in Support of its Motion for Summary Judgment ("Pl.'s Opening Br."), Ex. A ("MIPA") (D.I. 37).

[2] *See generally* MIPA.

[3] *Id.* art. VII (Indemnification).

[4] *Id*. § 7.02. Section 3.09(b) of the MIPA Disclosure Schedules defines the Raytheon Matter as follows: "On September 8, 2020, Raytheon delivered to the Company a Notice of Default and Reservation of Rights Letter related to the purchase orders identified therein. The Company responded to Raytheon in a letter dated September 22, 2020. The Company sent a letter to PPG on September 28, 2020, informing PPG of the reservation of rights and requesting that PPG preserve all documents related to the issue." Pl.'s Opening Br., Ex. F (the MIPA Disclosure Schedules) § 3.09(b) (internal definitions omitted).

party claims)."[5]

Additionally, the MIPA requires that certain notice of an indemnity claim must be given and specifies the procedures for such.[6] To that end, MIPA Section 7.05 reads:

> If any Indemnified Party receives notice of the assertion or commencement of any action, suit, claim, or other legal proceeding made or brought by any Person who is not party to this agreement or an Affiliate of a party to this agreement or a Representative of the foregoing (a 'Third-Party Claim') . . . the Indemnified Party shall give the Indemnifying Party prompt written notice thereof. . . . Such notice by the Indemnified Party shall describe the Third-Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practical, for the Loss that has been or may be sustained by the Indemnifying Party.[7]

Alongside the MIPA, the parties entered into an escrow agreement (the "Escrow Agreement") that set aside $23 million (the "escrow funds") for a specified period following the MIPA's execution.[8] Section 5(a)(i) of the Escrow Agreement provides that:

> [i]f prior to the 15-month anniversary of the Closing (the "Termination Date"), Buyer for itself or on behalf of any other Buyer Indemnitee shall assert any claim for indemnification by delivering to the Escrow Agent a claim notice (a "Claim Notice") of one of more claims for indemnity under Article VII

---

[5] MIPA art. I (Definitions).

[6] *Id*. art. VII (Indemnification).

[7] *Id.* § 7.05(a).

[8] *See generally* Pl.'s Opening Br., Ex. B ("Escrow Agreement").

of the [MIPA] (each, an "Indemnity Claim"), the Escrow Agent shall make payments with respect to such Indemnity Claim in accordance with this Section 5(a) of this Escrow Agreement.[9]

Section 5(a) also gives NSI-MI the opportunity to object to any indemnification claim.[10] Under the Escrow Agreement, the escrow agent will make a payment within 30 days of receiving a claim notice, "unless within said 30-calendar day period [NSI-MI] gives the Escrow Agent a written notice . . . explaining with reasonable specificity [NSI-MI]'s objections to such payment."[11] If an objection is timely made, "such claim shall be a 'Disputed Claim' and payment thereof shall be made only as provided in Section 5(b) of this Escrow Agreement."[12]

Section 5(b) of the Escrow Agreement then goes on to direct that the escrow agent must "not make any payment with respect to any Disputed Claim" until the disposition of the Disputed Claim has either been resolved "in writing by the Parties," or "by a final judgment of a court of competent jurisdiction."[13]

Escrow Agreement Section 5(c) provides, in relevant part, that "[w]ithin five (5) Business Days following the Termination Date" the escrow funds are to be released minus any outstanding claims.[14]

---

[9]   *Id*. § 5(a)(i) (underlining in original).

[10]   *Id*. § 5(a)(ii).

[11]   *Id*.

[12]   *Id*. (underlining in original).

[13]   *Id*. § 5(b).

[14]   *Id*. § 5(c).

## B. THE RAYTHEON MATTER

Prior to the MIPA transaction, NSI-MI had a contract with Raytheon Missiles and Defense to build Raytheon an anechoic chamber and related equipment.[15] According to Raytheon, NSI-MI ultimately failed to build a chamber that met that contract's specifications. And in September 2020, Raytheon delivered a Notice of Default and Reservation of Rights Letter to NSI-MI.[16]

Within the 15-month period specified in the Escrow Agreement, AMETEK submitted a Notice of Claims of Indemnity (the "Claims Notice") regarding the Raytheon Matter, as NSI-MI still had yet to produce an acceptable chamber.[17] In the Claims Notice, AMETEK sought indemnification of an undefined amount for losses incurred from the Raytheon Matter and requested the remaining escrow funds continue to be held until that issue was resolved.[18]

---

[15] *See* Pl.'s Opening Br., Ex. D ("Raytheon's Res. of Rights"); Defendant's Answering Brief in Opposition to Motion for Summary Judgment ("Def.'s Answering Br."), Ex. 1 (AMETEK 30(b)(6) Dep.) at 26 (D.I. 42); MIPA § 7.02(g).

[16] Raytheon's Res. of Rights.

[17] Pl.'s Opening Br., Ex. G ("Claims Notice") (D.I. 37).

[18] Claims Notice ("Since the Closing, NSI-MI Technologies, LLC (the "Company") has been working cooperatively with Raytheon and PPG to resolve the Raytheon Matter; however, at this time, the matter remains open. To Buyer's and the Company's information and belief, Raytheon continues to incur costs and other damages in connection with the Raytheon Matter. It is also unclear what, if any, remedies Raytheon may seek against the Company and what Remedies, if any, the Company may have against PPG. As a result, it is impossible at this time to determine the amount of Losses that the Buyer Indemnitees may incur . . . . As a result, [AMETEK] hereby directs that . . . the balance of all Escrowed Assets continue to be held by the Escrow Agent in the Escrow Fund and not released unless and until the Raytheon Matter is resolved.") (underlining in original).

NSI-MI responded to AMETEK's Claims Notice with a written notice of its objection (the "Objection Notice") insisting that AMETEK failed to make a valid claim.[19] NSI-MI's Objection Notice stated that because "[AMETEK] does not even attempt to estimate the amount of Loss in its [Claims Notice] and the [Claims Notice] fails to identify any specific loss, to identify the substance of any dispute or to enclose any material written evidence as required by Section 7.05 of the Purchase Agreement," AMETEK's Claim Notice "is insufficient to withhold any funds from being released related to the Raytheon Matter."[20] Additionally, NSI-MI objected that "[t]he [Claims Notice] . . . does not comport with the specificity commanded by the Escrow Agreement." [21]

To date, the escrow agent is withholding the remaining disputed escrow funds.[22]

## C. THE COMPLAINT AND THE MOTION FOR SUMMARY JUDGMENT

Because NSI-MI insists that AMETEK hasn't submitted a valid claim and that

---

[19] Pl.'s Opening Br., Ex. H ("Objection Notice") at 1 ("[w]ith respect to the Raytheon Matter, Buyer has failed to state an actual claim as required under the Purchase Agreement and Escrow Agreement. More specifically, as Buyer states in its own Notice, the Company has continued to work cooperatively with Raytheon . . . and . . . Raytheon has not sought any remedy against [AMETEK] . . . .").

[20] *Id*. at 2.

[21] *Id*.

[22] *See* Escrow Agreement § 5(b); Pl.'s Opening Br. at 3.

the escrow funds are being wrongfully withheld, it brought this action.[23] NSI-MI seeks declarations that AMETEK's Claims Notice fails to state an actual loss or claim under the MIPA and Escrow Agreement (Count I)[24] and that under the Escrow Agreement, the escrow funds should be released (Count II).[25] NSI-MI also says that AMETEK breached the Escrow Agreement by failing to allow release of the escrow funds (Count III)[26] and that it is due the attorney's fees and costs expensed in bringing this action (Count IV).[27]

After engaging in discovery, NSI-MI now moves for summary judgment on its amended complaint.[28]

## II. PARTIES' CONTENTIONS

The nub of this matter is whether the disputed escrow funds should be released and, if they must, to whom. NSI-MI contends the time for bringing a valid indemnity claim that would be paid specifically from the escrow funds via the Escrow Agreement has come and gone, and that AMETEK's failure to bring such mandates

---

[23] Plaintiff NSI-MI Holdings, LLC's First Amended Complaint ("Pl.'s First Amended Compl.") ¶¶ 60-84 (D.I. 23).

[24] *Id*. ¶¶ 60-63.

[25] *Id*. ¶¶ 64-67.

[26] *Id.* ¶¶ 68-76.

[27] *Id.* ¶¶ 77-84.

[28] Plaintiff NSI-MI Holdings, LLC's Motion for Summary Judgment ("Pl.'s Mot. for Summ. J.") (D.I. 36).

the escrow funds be returned to it.[29] AMETEK counters that it brought a valid indemnity claim—but if not, the time for distributing the escrow funds has not yet passed.[30]

## III. STANDARD OF REVIEW

Summary judgment is warranted upon a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[31]

Thus, on the issue raised, the moving party must demonstrate its prayer for summary judgment is supported by undisputed facts or an otherwise adequate record to support a legal judgment.[32] Only if the motion is properly supported, does the burden then shift to the opponent to demonstrate that there are material issues of fact that must be resolved by the ultimate factfinder.[33] Summary judgment might be granted when: "(1) the record establishes that, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact, and (2) in light of the relevant law and those facts, the moving party is legally entitled to

---

[29] Pl.'s Opening Br. at 14-25.

[30] Def.'s Answering Br. at 17-27.

[31] Del. Super. Ct. Civ. R. 56(c).

[32] *See CNH Indus. Am. LLC v. Am. Cas. Co. of Reading*, 2015 WL 3863225, at *1 (Del. Super. Ct. June 8, 2015).

[33] *Id.*

judgment."[34] But the Court cannot grant such judgment if the factual record hasn't been developed thoroughly enough to allow the Court to apply the law thereto.[35] All that said, a claim warrants summary judgment whenever an issue of law alone is involved and a trial is unneeded.[36]

## IV. DISCUSSION

### A. AMETEK DID NOT SUBMIT A VALID REALIZED INDEMNITY CLAIM.

In NSI-MI's view, AMETEK did not submit a valid claim under the MIPA because, *inter alia*, AMETEK hasn't incurred any losses in connection with the Raytheon Matter. But according to AMETEK, it has satisfied the contractual requirements for bringing an indemnification claim and the pending Raytheon Matter and mere potential of having to pay thereon is a "Loss" under the MIPA.[37] Further, says AMETEK, it's only required to "indicate the estimated amount, if reasonably practicable, for the Loss that has been or may be sustained by the Indemnified Party."[38]

---

[34] *Haft v. Haft*, 671 A.2d 413, 414-15 (Del. Ch. 1995) (citing *Burkhart v. Davies*, 602 A.2d 56, 58-59 (Del. 1991)); *see also Brooke v. Elihu-Evans*, 1996 WL 659491, at *2 (Del. 1996) ("If the Court finds that no genuine issues of material fact exist, and the moving party has demonstrated his entitlement to judgment as a matter of law, then summary judgment is appropriate.").

[35] *CNH Indus. Am. LLC*, 2015 WL 3863225, at *1.

[36] *See Unbound Partners Ltd. P'ship v. Invoy Hldgs. Inc.*, 2021 WL 1016442, at *4 (Del. Super. Ct. Mar. 17, 2021) ("[A] matter should be disposed of by summary judgment whenever . . . a trial is unnecessary." (internal quotation marks omitted) (quoting *Jeffries v. Kent Cty. Vocational Tech. Sch. Dist. Bd. of Educ.*, 743 A.2d 675, 677 (Del. Super. Ct. 1999)).

[37] Def.'s Answering Br. at 20-21.

[38] *Id.* at 21-22 (emphasis omitted) (quoting MIPA § 7.05(a)).

**1. The MIPA requires an extant reimbursable or compensable "Loss."**

Delaware courts "adhere[] to the 'objective' theory of contracts, i.e.[,] a contract's construction should be that which would be understood by an objective, reasonable third party."[39] "When the contract is clear and unambiguous, [this Court] will give effect to the plain-meaning of the contract's terms and provisions."[40] Only where a contract's contested operative provisions might be subject to multiple reasonable interpretations will it be deemed ambiguous thereon.[41] And when a contract is ambiguous in that regard, "factual issues requiring consideration of extrinsic evidence to determine the intended meaning of the provision[s] in light of the expectations of the contracting parties" abide.[42]

The MIPA's indemnity requirements are unambiguous. MIPA Section 7.02 provides that NSI-MI shall indemnify AMETEK "from and against, any and all Losses incurred or sustained by, or imposed upon, [AMETEK] based upon, arising out of, with respect to or by reason of . . . (g) the Raytheon Matter."[43] The MIPA defines "Loss" as "all losses, damages, liabilities, costs or expenses, including

---

[39]  *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[40]  *Id.* at 1159-60 (citing *Rhone-Poulenc Basic Chem. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

[41]  *Id.* at 1160.

[42]  *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1229 (Del. 1997).

[43]  MIPA § 7.02(g).

reasonable attorneys' fees (whether incurred in connection with third party or first party claims)."[44] As a whole, the plain language of the MIPA unambiguously requires NSI-MI to indemnify AMETEK for any losses, damages, liabilities, costs, expenses, or fees arising out of the Raytheon Matter—but the Escrow Agreement is used to pay only those actually realized and incurred before the 15-month termination of such.

To avoid this reality, AMETEK goes directly to the dictionary to propose a wide-ranging definition of "liabilities" that might foster a broader meaning of "Loss" and escrow encumbrance than that intended.[45] AMETEK's creative read fails. Contract interpretation requires construing the agreement "as a whole and giving effect to all its provisions," not just isolating individual terms.[46] Indeed, the Court "must read the specific provisions of the contract in light of the entire contract."[47] And it "will not read a contract to render a[ny] provision or term 'meaningless or illusory.'"[48]

---

[44] *Id.* art. I (Definitions).

[45] Def.'s Answering Br. at 21 ("Liability is commonly defined as 'the quality, state, or condition of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment.' It is clear that the Raytheon Matter and Notice of Default is a liability to AMETEK.") (quoting *Liability*, BLACK'S LAW DICTIONARY (11th ed. 2019)) (internal citations omitted).

[46] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014).

[47] *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 913–14 (Del. 2017).

[48] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (quoting *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992)).

If the Court were to ascribe a definition of "Loss" that includes the Raytheon Matter as a defined 'liability,' MIPA Section 7.02(g) would be rendered meaningless. Section 7.02(g) provides that NSI-MI shall indemnify AMETEK "from and against, any and all *Losses incurred or sustained* by, or imposed upon, [AMETEK] based upon, arising out of, with respect to or by reason of . . . *the Raytheon Matter*."[49] "Loss" is defined as "all losses, damages, *liabilities*, costs or expenses, including reasonable attorneys' fees."[50] If the mere existence of the Raytheon Matter is itself a loss, as AMETEK suggests, then the Raytheon Matter would be both a loss and the cause of a loss under Section 7.02. That makes little sense.

Instead, the defined term "liabilities" must be given meaning and interpreted using Delaware canons of contract interpretation. According to the well-established rule of *ejusdem generis*, "where general language follows an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned."[51] Another relevant rule here is *noscitur a sociis*, which requires that words "be

---

[49] MIPA § 7.02(g) (emphasis added).

[50] MIPA art. I (Definitions) (emphasis added).

[51] *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1265 (Del. 2004); *see also Delaware Bd. of Nursing v. Gillespie*, 41 A.3d 423, 427-28 (Del. 2012); *Pizzadili Partners, LLC v. Kent Cnty. Bd. of Adjustment*, 2016 WL 4502005, at *8 (Del. Super. Ct. Aug. 26, 2016).

interpreted in the context of words surrounding them."[52]  These two canons are oft employed together.[53]

Here, "liabilities" is found in a definitional list, positioned between "losses," "damages," "costs," "expenses," and "fees."[54]  Unlike what AMETEK posits, liabilities cannot be assigned its general dictionary-defined meaning; it must be read in its context and in harmony with the Escrow Agreement.  That means "liabilities" here is not simply to "be[] legally obligated or accountable"[55] generally or eventually.  It must instead be given a narrower connotation like those terms it accompanies.  Further, the Raytheon Matter is not of the same general kind or class as "costs," "expenses," or "fees"—terms that typically refer to specific payments or amounts, not ongoing contractual relationships.  AMETEK's suggested broad interpretation of the term "liabilities" is not that to be employed here.  Like the terms it is defined by, a stated "Loss" in the MIPA requires some already-acquired reimbursable or compensable amount for an indemnity claim to be valid and payable

---

[52]  *Zimmerman v. Crothall*, 2012 WL 707238, at *7 (Del. Ch. Mar. 5, 2012) (citing *Gutierrez v. Ada*, 528 U.S. 250, 255 (2000)).  Our Court of Chancery once used the following example to illustrate the principle: "if an agreement gave a broker the exclusive right to sell a farm's 'oranges, lemons, grapefruit, and other fruit,' a court might rely on the doctrine to interpret 'other fruit' to mean familiar types of citrus fruit and exclude melons, pineapples, and durians." *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, 2020 WL 7024929, at *58 (Del. Ch. Nov. 30, 2020) (quoting Kenneth A. Adams, *A Manual of Style for Contract Drafting* 360 (4th ed. 2017)).

[53]  *See, e.g.*, *Delaware Bd. of Nursing*, 41 A.3d at 427–28.

[54]  MIPA art. I (Definitions).

[55]  Def.'s Answering Br. at 21 (quoting *Liability*, BLACK'S LAW DICTIONARY (11th ed. 2019)).

-12-

through Section 5 of the Escrow Agreement.

But AMETEK suggests that to exclude unsustained or unliquidated losses, the contract must specifically spell such out.[56] For support, AMETEK points to *Post Holdings, Inc. v. NPE Seller Rep LLC*, where the Court of Chancery found that the presence of the term "owed" in the contested contract meant that a claim could not be for an "unliquidated" sum.[57] Because the term "owed" is not used here, AMETEK says the MIPA "clearly allow[s] for an indemnification claim to be made for an unknown amount . . . ."[58] Perhaps the *Post Holdings*' contract language was clearer, but no doubt the MIPA requires the same result.

The Court finds the MIPA clear—there must be a statement of an already-extant owing to another by AMETEK for a reimbursable or compensable loss to be a valid indemnity claim and a trigger of encumbrance of escrow funds via Section 5 of the Escrow Agreement.

### 2. AMETEK had (and apparently still has) not suffered a "Loss" when it filed its Claims Notice.

In its Claims Notice, AMETEK attempted to put in a placeholder for

---

[56] *Id.* at 22-23.

[57] 2018 WL 5429833, at *6-7 (Del. Ch. Oct. 29, 2018) (emphasis omitted).

[58] Def.'s Answering Br. at 22-23. And in this instance, not only would the amount be unknown, but to continue to tie up the escrow funds it need not be known if there would ever be an actual need for them to meet some obligation to Raytheon. *See* Claims Notice (" . . . It is also unclear what, if any, remedies Raytheon may seek against the Company and what Remedies, if any, the Company may have against PPG. . . .").

indemnity for the Raytheon Matter through escrow funds. But AMETEK does not have a valid indemnity claim obligating the Escrow Account, because it has not yet suffered a reimbursable or compensable loss from the Raytheon Matter. Nowhere in the Claims Notice does AMETEK provide the type of reimbursable or compensable amount for the Raytheon Matter anticipated by the plain language of MIPA Section 7.02. Instead, AMETEK states in its Claims Notice that: (a) NSI-MI "has been working cooperatively with Raytheon . . . to resolve the Raytheon Matter," (b) the matter "remains open," (c) it is "unclear what, if any, remedies Raytheon may seek," and (d) it is "impossible at this time to determine the amount of Losses" that may be incurred.[59]

The mere possibility of a "Loss" does not create a valid indemnity claim. In Raytheon's Reservation of Rights, Raytheon expressly reserved "all rights and remedies available," including "Raytheon's right to collect and recover all costs or other damages it *may* incur."[60] Despite its reservations, Raytheon has not initiated any actions against AMETEK. Raytheon's Reservation of Rights, without more, is not a reimbursable or compensable "Loss."

AMETEK points to Section 7.05 of the MIPA as support for its assertions that (1) a valid claim doesn't need to include a "Loss" and (2) a "Loss" need not be

---

[59] Claims Notice.

[60] Raytheon's Res. of Rights (emphasis added).

quantifiable.[61] But Section 7.05 is not interpreted in a vacuum. Again, the Court must "read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage."[62] And "where a contract provision lends itself to two interpretations, a court will not adopt the interpretation that leads to unreasonable results, but instead will adopt the construction that is reasonable and that harmonizes the affected contract provisions."[63]

MIPA Section 7.05 is preceded by Section 7.02, which provides the general terms and conditions for establishing an indemnity claim.[64] Section 7.02 specifies that NSI-MI will indemnify AMETEK for "any and all Losses incurred or sustained by . . . (g) the Raytheon Matter."[65] Once a "Loss" is incurred or sustained, Section 7.05, titled "Indemnification Procedures," then provides the applicable procedures necessary to assert an indemnification claim. Specifically:

> If any Indemnified Party receives notice of the assertion or commencement of any action, suit, claim, or other legal proceeding made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a 'Third Party Claim') against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party prompt written notice thereof … Such notice by

---

[61] Def.'s Answering Br. at 17-22.

[62] *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010) (citation omitted).

[63] *Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. 2010) (citations omitted).

[64] MIPA § 7.02 (Indemnification By Seller).

[65] *Id.* § 7.02(g).

the Indemnified Party shall describe the Third-Party Claim in reasonable detail, shall include copies of all material written evidence thereof and *shall indicate the estimated amount, if reasonably practicable, for the Loss that has been or may be sustained by the Indemnified Party.*[66]

Notice under Section 7.05(a) of the agreement only requires a description of the claim "in reasonable detail" and an indication of the estimated amount for the Loss "that has been or may be sustained" "if reasonably practical."[67] AMETEK may have satisfied these notice requirements, but AMETEK simply has not yet suffered a "Loss" as is required under Section 7.02. As explained before, "Loss" under Section 7.02 requires an extant obligation of a reimbursable or compensable amount; Section 7.05 doesn't alter that requirement. Whether AMETEK's description of such "Loss" in its Claims Notice meets the requirements of Section 7.05(a) is immaterial when no "Loss" has yet been suffered.

Accordingly, summary judgment on NSI-MI's claim for declaratory relief in Count I is **GRANTED**; AMETEK did not state a valid claim for indemnity under the MIPA.

## B. THE ESCROW FUNDS MUST BE RELEASED.

NSI-MI moves for summary judgment on its claim for declaratory relief on Count II of its complaint alleging that, pursuant to Section 5(c) of the Escrow

---

[66] *Id.* § 7.05 (emphasis added).

[67] MIPA § 7.05(a).

Agreement, the remaining escrow funds must be released. Delaware courts apply the plain meaning of the contract when it's clear and unambiguous.[68] "A contractual provision is not ambiguous merely because the parties disagree as to how it is to be interpreted."[69]

Section 5(c) of the Escrow Agreement requires that "[w]ithin five (5) Business Days following the Termination Date, [NSI-MI] and [AMETEK] shall deliver a Joint Instruction to the Escrow Agent to pay . . . the Initial Release Amount."[70] The Initial Release Amount is defined as "an amount equal to the difference of . . . the Indemnity Escrow Amount as of the date of release, minus . . . Outstanding Claims," including Disputed Claims.[71]

Other provisions of the Escrow Agreement are also relevant. A Disputed Claim is defined in Section 5(a) as an indemnity claim responded to with "an Objection Notice explaining with reasonable specificity . . . objections to such payment."[72] The Objection Notice must be sent within 30 days of the indemnity

[68] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60; *see also Rhone–Poulenc Basic Chem. Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992) ("Clear and unambiguous language . . . should be given its ordinary and usual meaning.").

[69] *McAnulla Elect. Const., Inc. v. Radius Techs., LLC*, 2010 WL 3792129, at *4 (Del. Super. Ct. Sept. 24, 2010) (citing *Rhone–Poulenc Basic Chem. Co.*, 616 A.2d at 1196).

[70] Escrow Agreement § 5(c).

[71] *Id*.

[72] *Id*. § 5(a)(ii) (cleaned up).

claim.[73]  If an indemnity claim becomes a Disputed Claim, then payment may only be made as provided in Section 5(b) of the Escrow Agreement.[74]  Section 5(b) states that the escrow agent must "not make any payment with respect to any Disputed Claim" until the disposition of the Disputed Claim has either been resolved "in writing by the Parties," or "by a final judgment of a court of competent jurisdiction."[75]

NSI-MI is entitled to the release of the withheld escrow funds in accordance with the Escrow Agreement's plain terms.  It is undisputed that the Termination Date of the Escrow Agreement occurred on July 22, 2022.[76]  What is disputed is the indemnity claim itself.  Within 30 days of receiving AMETEK's indemnity claim, NSI-MI responded with a valid Objection Notice.[77]  In its Objection Notice, NSI-MI explained with reasonable specificity its objections to such payment.[78]  Consequently, AMETEK's indemnity claim became a Disputed Claim as defined in

---

[73]  *Id.*

[74]  *Id.*

[75]  Escrow Agreement § 5(b).

[76]  *See id.* § 5(a)(i); Pl.'s Opening Br. at 25; Def.'s Answering Br. at 4.

[77]  Objection Notice; Escrow Agreement § 5(a)(ii).

[78]  *See* Objection Notice ("as [AMETEK] states in its own [Claims] Notice, [NSI-MI Technologies, LLC] has continued to work cooperatively with Raytheon and [PPG] since the Closing, and more importantly, Raytheon has not sought any remedies against [NSI-MI Technologies, LLC] . . . no Losses have been incurred or imposed . . . and no damages are alleged . . . [t]herefore, [AMETEK's Claims] Notice is insufficient to withhold any funds from being released to the Raytheon Matter.").

the Escrow Agreement. So, the escrow agent was required to withhold any payments until the disposition of the Disputed Claim.

The Court now resolves the Disputed Claim by final judgment. As explained earlier, AMETEK failed to state a valid indemnity claim that would allow withholding of the escrow funds.[79] Accordingly, the Disputed Claim is resolved in NSI-MI's favor. Now resolved, the escrow funds currently withheld are no longer the subject of a Disputed Claim. Additionally, the Termination Date has long passed. The escrow agent must—in accord with Section 5(c) of the Escrow Agreement—release the withheld funds from the Escrow Account.

To resist release of the escrow funds here and now, AMETEK turns to *Sparton Corp. v. O'Neil*.[80] In *Sparton Corp.*, the Court of Chancery found that the subject escrow funds had to be released because the subject escrow agreement provided a specific date and required the funds be distributed "regardless if any [Specific Indemnity Escrow Claims] remain pending and have not been settled or otherwise resolved."[81]

AMETEK says that because such explicit termination language is absent from this Escrow Agreement, the agreement is either ambiguous or shows the parties'

---

[79] *See supra* IV(A).

[80] 2018 WL 3025470 (Del. Ch. June 18, 2018).

[81] *Id.* at *2-3 (alteration in original) (quoting agreement).

-19-

intent to withhold outstanding claims indefinitely.[82]  Not so.

AMETEK ignores specific provisions of the two agreements here.  As previously discussed, Section 5(b) of the Escrow Agreement provides that the disposition of withheld escrow funds may be resolved through written agreement or by final judgment of a court of competent jurisdiction.[83]  This language itself belies any alleged intent of the parties to withhold escrow funds indefinitely.

What's more, MIPA Section 7.01 provides that NSI-MI will indemnify AMETEK for losses suffered from the Raytheon Matter for up to six years from the Closing Date.[84]  That is, the indemnification obligation for the Raytheon Matter does indeed extend after the Escrow Agreement's Termination Date.[85]  But the parties clearly contemplated encumbering Escrow Account funds for the indemnification of only those Raytheon Matter losses actualized within the first 15-month period from closing.  If not yet actualized in those first 15 months, however, any required indemnification for Raytheon Matter losses during the remainder of the six-year period would come from non-escrow funds.  No intent to withhold escrow funds indefinitely can be derived from the unambiguous language of the two agreements.

---

[82]  AMETEK's Supplemental Letter ("AMETEK's Supp. Let.") at 3-4 (D.I. 52).

[83]  *See* Escrow Agreement § 5(b).

[84]  MIPA § 7.01 (Survival).

[85]  *Id.*

As a last resort, AMETEK suggests further discovery is needed.[86]  But the MIPA and Escrow Agreement are clear and unambiguous—the withheld escrow funds must be released.  Discovery to gather any additional extra-contractual information is unneeded considering the clear and unambiguous contractual language.[87]

NSI-MI is entitled to a declaratory judgment releasing the withheld escrow funds under the Escrow Agreement.  Summary judgment on Count II is **GRANTED**.

## C. THE OTHER COUNTS IN NSI-MI'S AMENDED COMPLAINT AND THE MOTION IT HAS PROSECUTED HERE.

While NSI-MI penned a four-count complaint, it moved for summary judgment "pursuant to Superior Court Civil Rule of Procedure 56, seeking a declaratory judgment releasing escrowed funds to NSI-MI pursuant to the Parties' Escrow Agreement, an award of damages, including interest and costs, and any other relief this Court deems just and proper."[88]  It then went on to give little breath to its breach-of-contract and attorney's fees claims.  In other words, while NSI-MI does not expressly say so, its motion focuses on obtaining the declarations sought in Counts I and II with the aphonic understanding that a win thereon by and large

---

[86]  Def.'s Answering Br. at 27-29.

[87]  *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.") (citations omitted)).

[88]  Pl.'s Opening Br. at 1.

obviates its breach-of-contract count.[89]   That said, the resolution of NSI-MI's declaratory claims does not ineluctably lead to a finding that AMETEK breached its obligation to NSI-MI by not agreeing to release of the escrow funds or that NSI-MI has suffered otherwise compensable damages as a result.

A Delaware breach-of-contract claim has three elements: "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."[90]

Given the record, it is not at all clear that AMETEK breached the terms of either the MIPA or the Escrow Agreement.  Per the requirements of MIPA Section 7 and the Escrow Agreement's Section 5, AMETEK filed a claim notice for indemnity via escrow funds within the 15-month period of the Closing Date.[91]  NSI-MI then objected to those funds being tapped and AMETEK's claim became a Disputed Claim.[92]  Because of the Disputed Claim escrow funds have been since

---

[89]   For good reason, the breach-of-contract claim merely reconstitutes the declaratory judgment counts—*See* Pl.'s First Amended Compl. ¶ 73 ("AMETEK is in violation of Section 5(c) of the Escrow Agreement, which required AMETEK to release of the remaining assets within five business days of the Termination Date.")—with damages articulated in a slightly different way. *Id.* ¶¶ 74-75 ("To date, NSI-MI Holdings has been deprived of the benefit of the return of its own money for over three (3) months. . . . . As a result, NSI-MI Holdings has suffered damages and lost interest . . . .").

[90]   *Humanigen, Inc. v. Savant Neglected Diseases, LLC*, 238 A.3d 194, 202 (Del. Super. Ct. 2020) (citations omitted).

[91]   *See* Claims Notice.

[92]   *See* Objection Notice.

-22-

withheld in accordance with Section 5(b) of the Escrow Agreement.[93]  These facts alone do not demonstrate that AMETEK breached the terms of the agreements. Instead, it appears on the face of the record now before the Court that the contractually prescribed procedure was followed.

Accordingly, to the extent NSI-MI sought summary judgment on its breach-of-contract claim (Count III), that request is **DENIED**.

In Count IV, NSI-MI seeks attorney's fees and costs because of AMETEK's failure to sign off on distribution of the escrow funds and, in its view, undue forcing of NSI-MI to bring this suit.[94]  Again, NSI-MI says next to nothing of this particular in claim in its summary judgment motion or its briefing.

Delaware courts follow the "American Rule" that "litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorney's fees, which, in equity, may be awarded at the discretion of the court."[95]  The American Rule has two general categories of exceptions: fee-shifting statutes and equitable doctrines.[96]

To the extent it has sought summary resolution of its ask for attorney's fees

---

[93]  *See* Escrow Agreement § 5(b).

[94]  Pl.'s First Amended Compl. ¶¶ 77-84.

[95]  *MBKS Co. Ltd. v. Reddy*, 924 A.2d 965, 977 (Del. Ch. 2007) (citations omitted).

[96]  *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1164 (Del. 1989); *Walsh v. Hotel Corp. of America*, 231 A.2d 458, 462 (Del. 1967); *Maurer v. International Re–Insurance Corp.*, 95 A.2d 827, 830-31 (Del. 1953) (enumerating equitable exceptions).

and costs, NSI-MI is not entitled to Rule 56 judgment thereon. The American Rule requires a specific showing of special circumstances that warrant a departure from the norm that litigants are responsible for the payment of their own attorney's fees. NSI-MI may have alluded to attorney's fees and costs in the introductory and concluding sections of its summary judgment briefing,[97] but it has not made the substantive showing required. So, summary judgment on NSI-MI's attorney's fees claim in Count IV is **DENIED**.

## V. CONCLUSION

For the foregoing reasons, NSI-MI's Motion for Summary Judgment is **GRANTED** as to Counts I and II and **DENIED** as to Counts III and IV.

**IT IS SO ORDERED.**

_____
Paul R. Wallace, Judge

Original to Prothonotary
cc: All counsel via File & Serve

---

[97] *See* Pl.'s Opening Br. at 25 ("NSI-MI respectfully requests entry of summary judgment in its favor, awarding declaratory judgment, releasing escrowed funds pursuant to the Parties' Escrow Agreement to NSI-MI, awarding damages including interest and costs, and any other relief and judgment the Court deems just and proper.").